```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #:_____          │
│ DATE FILED:__5/27/2025___       │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

DILIGENT ENTERPRISE MANAGEMENT,
LLC,

                        Plaintiff,

          -against-

AML GLOBAL ECLIPSE, LLC, DWC PINE
INVESTMENTS I, LTD., ALAN KLAPMEIER,
JAMES CARROLL, STEVE SERFLING, RJ
SIEGLE, and MIKE WYSE,

                       Defendants.

-------------------------------------------------------------X

24-CV-2228 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

      Diligent Enterprise Management, LLC ("Diligent") sued AML Global Eclipse ("AML")

and DWC Pine Investments I, Ltd. ("DWC"), along with former directors and officers of ONE

Aviation Corp. ("ONE Aviation") Alan Klapmeier, James Carroll, Steve Serfling, RJ Siegle, and

Mike Wyse (the "Individual Defendants"), in New York state court asserting breach of contract

and tort claims.  Defendants removed to this Court.  Diligent moved to remand the case to state

court, and Defendants cross-moved to transfer the case to the United States District Court for the

District of Delaware.  Defendants also seek costs and sanctions for Diligent's vexatious conduct

in responding to Defendants' efforts to remove and transfer this action.  For the following

reasons, Diligent's motion to remand is DENIED, and Defendants' motion to transfer is

GRANTED.  Defendants' motion for costs and sanctions is GRANTED in part and DENIED in

part.

# BACKGROUND[1]

Diligent's claims relate chiefly to a series of agreements between DWC and Citiking International US LLC ("Citiking"); Diligent is the assignee of Citiking's claims. *See* Keats Decl., Dkt. 49, Ex. 41 at 4 ("State Compl."), ¶¶ 1, 14, 18, 20, 23, 30, 36. Those agreements governed the sale of certain loan obligations of affiliates of ONE Aviation; the loan obligations were created prior to the bankruptcy of ONE Aviation. *Id.* ¶¶ 14–15, 17. Prior to any transfers, DWC owned the loans, which were underperforming. For purposes of the relevant transactions, the loans were broken into two groups: First Tranche Loans and Second Tranche Loans (collectively "the Loans"). *See id.*

## I.    The First and Second Tranche Loan Sales

On or about November 10, 2017, DWC sold Citiking the First Tranche Loans pursuant to a Purchase and Sale Agreement for Distressed Trades (the "First PSA"). *Id.* ¶ 14. The loans were secured by a blanket lien against ONE Aviation and certain of its affiliates (the "Affiliates") and guaranteed by ONE Aviation. *Id.* ¶ 15. At or around the same time, DWC and Citiking entered an Intercreditor Agreement that gave both parties a Right of First Refusal if either received an offer to purchase the First Tranche Loans or the Second Tranche Loans. *Id.* ¶¶ 18–19.

On or about July 10, 2018, DWC sold and assigned to Citiking the Second Tranche Loans pursuant to a Purchase and Sale Agreement for Distressed Trades (the "Second PSA").

---

[1]    Citations to the State Complaint reflect allegations made by Diligent; the Court, however, is permitted to consider materials outside the pleadings "that convey information essential to the court's jurisdictional analysis." *Michael J. Redenburg, Esq. PC v. Midvale Indem. Co.*, 515 F. Supp. 3d 95, 102 (S.D.N.Y. 2021) (quoting *Romano v. Kazacos*, 609 F.3d 512, 520 (2d Cir. 2010)). To that end, where noted the Court takes judicial notice of certain filings from ONE Aviation's bankruptcy proceedings cited by the parties "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

*Id.* ¶ 20. Citiking and DWC also entered into a Continuing Obligations Agreement that allowed DWC to repurchase the Second Tranche Loans if Citiking defaulted under the Second PSA. *Id.* ¶¶ 23–29. On August 24, September 10, September 24, and October 10, 2018, DWC issued Default Notices to Citiking. *Id.* ¶ 33. On January 18, 2019, DWC repurchased the Second Tranche Loans from Citiking. *Id.* ¶¶ 34–35.

## II.    ONE Aviation's Bankruptcy

On October 9, 2018, between the sale and the repurchase of the Second Tranche Loans, ONE Aviation and its affiliates (collectively, "Debtors") filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). *Id.* ¶¶ 44–45. The next day, Debtors filed a motion for approval of debtor in possession financing (the "DIP Loan"). *Id.* ¶ 46. Under the proposal, the DIP Loan would be made by Citiking; ONE Aviation would guarantee the loan. *Id.* On November 27, 2018, the Bankruptcy Court approved the DIP Loan and granted Citiking a senior lien and super priority administrative status (the "DIP Order"). *Id.* ¶ 47.

On June 17, 2019, Debtors moved for approval of a sale of the Debtors' assets, bidding procedures, and a Stalking Horse Agreement with Citiking as the Stalking Horse Buyer (the "First Sale Motion"). *Id.* ¶ 54. The proposed bidding procedures permitted Citiking to "credit bid" the amounts that Debtors owed it. *Id.* ¶ 55. As proposed, credit bidding would have relieved Citiking of the need for cash to bid and would have meant that if Citiking were outbid at the auction, the cash from the successful bidder would necessarily satisfy the amount Debtors owed Citiking. *Id.*

## III.    The Letter Agreement

On July 25, 2019, Citiking and DWC agreed that Citiking would repurchase the Second Tranche Loans. *Id.* ¶¶ 36–37; Keats Decl. Ex. 44 ("Letter Agreement"). The Letter Agreement

contemplated that Citiking and DWC intended the Debtors to withdraw the First Sale Motion and file a plan of reorganization (the "Reorganization Plan").  *See* Letter Agreement at 2; Def. Mem., Dkt. 48, at 3.  The Reorganization Plan would incorporate certain terms, including that DWC would not object to the Reorganization Plan so long as Citiking either paid all amounts due to DWC or agreed to provide exit financing.  Letter Agreement at 2.  The Letter Agreement provided that several prior agreements between Citiking and DWC, including the Second PSA and the Continuing Obligations Agreement, "constitute[d] the entire agreement and understanding between the parties."  *Id.* at 3; State Compl. ¶ 38.  Citiking made a payment to DWC on July 25, 2019, and owed another payment by October 31, 2019.  State Compl. ¶¶ 40–41.

## IV.    Subsequent Bankruptcy Court Proceedings

The day after the effective date of the Letter Agreement, on July 26, 2019, Debtors withdrew the First Sale Motion; on August 30, 2019, Debtors filed an amended Reorganization Plan.  *See* Def. Mem. at 3 (citing Keats Decl. Exs. 4–5).[2]

Almost a year later, the Official Committee of Unsecured Creditors (the "Committee") moved to convert the Chapter 11 case to one under Chapter 7.  *See* Keats Decl. Ex. 7.  The Committee accused Citiking of using the Reorganization Plan's effective date as leverage to negotiate concessions of fees and of failing to fund a loan facility with DWC.  *Id.* ¶ 13.  The Committee further claimed that the bankruptcy proceedings had "been plagued by delay, disputes, and funding issues" despite Citiking's "repeated assurances" that the Reorganization Plan would become effective by the end of 2019.  *Id.* ¶ 21.

---

[2]    Diligent alleges that Debtors withdrew the First Sale Motion on July 10, 2019, State Compl. ¶ 58, but the Court takes judicial notice that the motion was withdrawn on July 26, 2019, *see* Keats Decl. Ex. 4.

On August 28, 2020, Debtors filed another motion to approve the sale of assets (the "Second Sale Motion"); the Second Sale Motion proposed SEF OA LLC as the Stalking Horse Buyer and proposed to allow Citiking to credit bid.  State Compl. ¶ 59.  In a Declaration filed the same day, Mr. Carroll, a former board member of ONE Aviation who served as an Independent Director from approximately 2018 to 2020, *id.* ¶ 5, averred that Citiking had admitted during two conference calls that it could not "meet its funding obligations under the Plan to go effective." Keats Decl., Ex. 10, ¶ 18.

The Bankruptcy Court held an evidentiary hearing on the Second Sale Motion and found that Citiking had neither the willingness nor the ability to close due to a standoff with DWC regarding exit financing.  Keats Decl., Ex. 13, at 38:1–6.  In addressing whether approving the Second Sale Motion would violate the DIP Order, the Bankruptcy Court found that it had authority to interpret certain "subordination agreements" between DWC and Citiking, but that a court in a subsequent proceeding could conceivably disagree with its interpretation.  *Id.* at 28:24– 29:5.  The Bankruptcy Court Judge further observed that the Bankruptcy Court had "jurisdiction to make a finding that the subordination agreement [was] valid and enforceable for the purposes of" funding the DIP Loan, but offered no opinion on  "[w]hether that finding is *collateral estoppel* or [would have a] *res judicata* effect in a subsequent, non-bankruptcy litigation between Citiking or DW[C];" the Bankruptcy Court did not intend "to finally adjudicate that issue between those two parties" and noted that they were welcome "to sue each other in federal or state court in New York."  *Id.* at 41:18–42:10.[3]  The Bankruptcy Court approved the Second Sale Motion.  Keats Decl. Exs. 11–12.

---

[3]    In a later hearing, the Bankruptcy Court viewed the issue of contractual subordination as "more of a[n] intercreditor dispute between DW[C] and Citiking that I may ultimately decide, or I may let my sister courts in New York ultimately decide."  Keats Decl., Ex. 18, at 106:15–17.

In October 2020, Debtors withdrew the Second Sale Motion and made a Third Sale Motion, this time proposing AML as the Stalking Horse Buyer. State Compl. ¶¶ 60–61. Debtors proposed to revise their bidding procedures to require any qualifying bid to contain terms no less favorable than AML's bid. *Id.* ¶ 65. After Debtors acknowledged that DWC intended to exercise its right to credit bid against AML, AML increased its bid by depositing the full purchase price, and Debtors filed revised bidding procedures that effectively barred credit bidding. *Id.* ¶¶ 64, 66–67. The net effect was that Citiking would have to bid the entire purchase price of $5,250,000 to qualify as a bidder, and it could not credit bid the First Tranche Loans, which totaled approximately $21,000,000. *Id.* ¶ 68.

On November 20, 2020, the Bankruptcy Court held a sale hearing. *Id.* ¶ 71. Counsel for DWC revealed that AML had agreed to purchase the Debtors' secured debt, including the Second Tranche Loans, from DWC upon the entry of an order approving the sale of Debtor's assets to AML. *Id.* The same day, the Bankruptcy Court approved the sale of Debtors' assets to AML at the purchase price. *Id.* ¶ 69. As part of that order, the Bankruptcy Court retained jurisdiction "to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale." Keats Decl., Ex. 19 (the "Sale Order"), ¶ 59. Citiking appealed the Sale Order and filed emergency stay motions, first before the Delaware District Court, then before the Third Circuit; both stay motions were denied. Keats Decl., Exs. 33–34, 36–38. On February 18, 2021, the Debtors' bankruptcy was converted from Chapter 11 to Chapter 7. State Compl. ¶ 86.

On July 13, 2021, Citiking objected to the allowance of any claim asserted by AML before the Bankruptcy Court. Keats Decl. Ex. 23. Citiking raised several arguments that Diligent now asserts as its assignee, including that AML and DWC had conspired to deprive Citiking of its right to credit bid and that the sale of the Debtors' secured debt to AML violated Citiking's right of first refusal in the Intercreditor Agreement. *Id.* ¶¶ 2–3, 8. In September 2021,

Citiking adjourned the objection but raised it again in March 2022 to oppose a distribution settlement reached by the Chapter 7 Trustee. Keats Decl. Exs. 26, 28. On June 23, 2023, certain interested parties, including the Chapter 7 Trustee, AML, and Citiking, reached a settlement on distributions; Citiking withdrew its objection in exchange for $950,000. Keats Decl. Exs. 30–31.

## V.    Procedural History

On July 20, 2023, Diligent filed a Summons with Notice in New York State Supreme Court against Defendants and two other individuals; a Complaint that omitted one of the individuals followed on November 17, 2023. *See Diligent Enter. Mgmt., LLC v. AML Glob. Eclipse, LLC et al.*, 23-cv-10924-VEC ("*Diligent I*"), Dkt. 1-1. On December 15, 2023, Defendants removed the case to this Court. *Id.*, Dkt. 1.[4] During briefing of cross-motions to remand and transfer, on March 12, 2024, Diligent voluntarily dismissed every Defendant except DWC. *Id.*, Dkt. 25. On March 15, 2024, Diligent voluntarily dismissed its case against DWC. Both dismissals were without prejudice. *Id.*, Dkt. 26.

The same day that Diligent completed its dismissal of *Diligent I* in this Court, it filed a substantively identical complaint in New York State Supreme Court. *See* Dkt. 1-1. At a March 22, 2024 hearing that had been scheduled before *Diligent I* was dismissed and was held notwithstanding the dismissal because of the newly-filed identical lawsuit, Diligent's counsel "agreed to meet and confer regarding a proposed briefing schedule to address all threshold issues, including sufficiency of service, remand, and transfer." *See* Dkt. 17 at 2. On March 25, 2024, Defendants again removed the case to this Court. *See* Dkt. 1.

Rather than negotiate a briefing schedule as it had agreed, on April 24, 2024, Diligent informed the Court that it was "unable to proceed with this lawsuit" and asked the Court to

---

[4]    The only defendant named in that Complaint who is not a party to this action was dismissed by stipulation on February 15, 2024. *Diligent I*, Dkt. 20.

authorize a second dismissal without prejudice.  *See* Dkt. 11.  The Court denied Diligent's request for a second no-prejudice dismissal, finding that Diligent had "been unduly vexatious and created duplicative expenses for Defendants" and "offered no cogent explanation for its sudden desire to dismiss" this action; rather, the Court determined that Diligent's "decision to file a new complaint the very same day [it dismissed the prior complaint] undermine[d] its stated concerns about its financial status and [could] only be described as vexatious."  Dkt. 17 at 3–4.

On September 6, 2024, Diligent moved to remand this action to state court.  *See* Dkt. 44.  Defendants cross-moved to transfer the case to the Delaware District Court, and certain Defendants also moved for costs and sanctions in connection with *Diligent I* and this lawsuit, respectively.  *See* Dkts. 47, 50.

## DISCUSSION

The State Complaint asserts several claims for relief.  Diligent alleges that DWC breached the Letter Agreement and the Continuing Obligations Agreement when it sold the Second Tranche Loans to AML rather than delivering and assigning the loans to Citiking.  State Compl. ¶¶ 95–107.  Diligent further argues that even if DWC had the right to sell the Second Tranche Loans, it breached the Intercreditor Agreement by failing to provide Citiking with its right of first refusal prior to selling the loans.  *Id.* ¶¶ 89–94.  Diligent also asserts several tort claims all pertaining to the Bankruptcy Proceedings: tortious interference against AML and civil conspiracy against both AML and DWC for allegedly freezing Citiking out of the bankruptcy proceedings; *id.* ¶¶ 108–22; and fraudulent inducement and fraudulent misrepresentation claims against the Individual Defendants for actions they took while they were officers or directors of ONE Aviation, *id.* ¶¶ 123–52.

I.    **Cross-Motions to Remand and Transfer**

Courts presented with competing motions to remand and transfer address the remand motion first. *Worldview Ent. Holdings Inc. v. Woodrow*, 611 B.R. 10, 15 (S.D.N.Y. 2019); *Delaware Tr. Co. v. Wilmington Tr., N.A.*, 534 B.R. 500, 510 (S.D.N.Y. 2015).

A.  **Diligent's Motion to Remand**

1.  *Applicable Law*

"A party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under" 28 U.S.C. § 1334(b).  28 U.S.C. § 1452(a).  A court has jurisdiction under Section 1334(b) "of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).[5]  The district court may remand the claim or cause of action "on any equitable ground." 28 U.S.C. § 1452(b).

Proceedings arise under title 11 only if they "clearly invoke substantive rights created by federal bankruptcy law." *In re Robert Plan Corp.*, 777 F.3d 594, 596 (2d Cir. 2015) (citation omitted).  Although the scope of "arising in" jurisdiction is less clear, at a minimum it "includes claims that 'are not based on any right expressly created by [T]itle 11, but nevertheless, would have no existence outside of the bankruptcy.'" *In Matter of Motors Liquidation Co.*, 829 F.3d 135, 153 (2d Cir. 2016) (citation omitted).  The scope of "related to" jurisdiction is broader still and includes an action "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 340 (2d Cir. 2018) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995)).

---

[5]    Defendants assert that the District of Delaware has "arising in" or "related to" jurisdiction over Diligent's claims.

Proceedings that arise under title 11 or arise in a bankruptcy case are core proceedings allowing bankruptcy courts to "retain comprehensive power to resolve claims and enter orders or judgments." *Motors Liquidation*, 829 F.3d at 153. Claims "related to" title 11 proceedings are "non-core," meaning that a court hearing such claims may be required to abstain in favor of the state court. *Worldview Ent. Holdings*, 611 B.R. at 18 (citing *Baker v. Simpson*, 613 F.3d 346, 350 (2d Cir. 2010)).

Section 1334(c)(2) governs mandatory abstention. *See* 28 U.S.C. § 1334(c)(2). Mandatory abstention applies if there is (a) a timely motion to abstain in an action based on state law that does not arise in or under the Bankruptcy Code, (b) Section 1334 provides the sole basis for federal jurisdiction, and (c) the action was commenced and can be timely adjudicated in state court. *Fried v. Lehman Bros. Real Est. Assocs. III, L.P.*, 496 B.R. 706, 711 (S.D.N.Y. 2013).

Permissive abstention is discretionary and applies to any proceeding arising under title 11 or arising in or related to a case under title 11. 28 U.S.C. § 1334(c)(1). To decide whether to abstain in such cases, courts "balance the federal interest in efficient bankruptcy administration against the interest of comity between the state and federal courts" in a multi-factor analysis. *See Fried*, 496 B.R. at 712–13 (S.D.N.Y. 2013).

### 2. Diligent's Breach of Contract Claims Are Core Proceedings

"[W]hether a contract proceeding is core depends on (1) whether the contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization." *In re U.S. Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999). Under the second prong, a proceeding is core if "the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings" or "directly affects a core bankruptcy function," such as "[f]ixing the order of priority of creditor claims against a debtor" and "plac[ing] the property of

the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors." *Id.* (citations omitted).

In *U.S. Lines*, the Second Circuit was unanimous except as to one paragraph concerning how courts should assess claims that allege a post-petition breach of a pre-petition contract. *See id.* at 637–38, 638 n.1. Judge Walker, who otherwise wrote the unanimous opinion, favored a case-by-case approach and suggested that "a dispute arising from a pre-petition contract will usually not be rendered core simply because the cause of action could only arise post-petition." *Id.* at 638. Judge Newman would have adopted a bright-line rule treating all suits alleging post-petition breaches as core, reasoning that the broad scope of core proceedings captured "a cause of action that did not exist until the jurisdiction of the bankruptcy court attached." *Id.* at 641–43 (Newman, J., concurring).[6]

Although the Second Circuit has not revisited the split, courts tasked with analyzing post-petition breaches of pre-petition contracts have generally applied the case-by-case approach. Claims for damages for the breach of pre-petition contracts are "generally non-core," especially where the claims are "creatures of state law that depend neither on bankruptcy law nor on bankruptcy jurisdiction." *ICICI Bank Ltd. v. Essar Glob. Fund Ltd.*, 565 B.R. 241, 249 (S.D.N.Y. 2017) (citing *In re Orion Pictures Corp.*, 4 F.3d 1095, 1102 (2d Cir. 1993)). For example, a breach of contract claim brought "by a debtor against a party to a pre-petition contract, who has filed no claim with the bankruptcy court, is non-core," *In re Lenders Abstract & Settlement Serv. Inc.*, 493 B.R. 385, 394 (E.D.N.Y. 2013) (quoting *Orion*, 4 F.3d at 1102), and the Second Circuit has rejected a "general rule" that any contract claim involving property of the

---

[6]    Judge Calabresi thought it unnecessary to reach the question to resolve the dispute. *U.S. Lines*, 197 F.3d at 643 (Calabresi, J., concurring).

debtor's estate is core or that a dispute arising from a pre-petition contract is rendered core because the claim "could only arise post-petition," *id.* (quoting *U.S. Lines*, 197 F.3d at 637–38).

Notwithstanding the fact that disputes over pre-petition contracts generally give rise to non-core proceedings, the Second Circuit has held that disputes over such contracts are core proceedings when the actions are uniquely affected by or directly affect bankruptcy proceedings. *See In re DPH Holdings Corp.*, 448 F. App'x 134, 136–37 (2d Cir. 2011) (unpublished) (proceeding was core where six of the eighteen contracts at issue were formed post-petition, and the disposition of the remaining contract claims would affect the allowance of certain claims asserted in the bankruptcy); *In re Petrie Retail, Inc.*, 304 F.3d 223, 229–31 (2d Cir. 2002) (post-petition dispute over a pre-petition lease raised in a plan consummation motion deemed core because it was uniquely affected by the bankruptcy proceedings).  Furthermore, parties "who submit proofs of claim and thereafter actively litigate in the bankruptcy court without contesting personal jurisdiction can transform a non-core proceeding into a core one."  *In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 98 (2d Cir. 2005).

### a.   Breach of the Letter Agreement

Diligent's claim regarding DWC's purported breach of the Letter Agreement is a core proceeding that arises in ONE Aviation's bankruptcy.  Proceedings involving breach of a post-petition contract that either are uniquely affected by the bankruptcy proceedings or directly affect a core bankruptcy function are core.  *U.S. Lines*, 197 F.3d at 637.  The Letter Agreement was entered into on July 25, 2019, well after ONE Aviation filed its bankruptcy petition.  State Compl. ¶¶ 36, 44.

It is clear from the face of the Letter Agreement that Diligent's claim "would have no existence outside of the bankruptcy." *Motors Liquidation*, 829 F.3d at 153 (citation omitted). When entering into the Letter Agreement, Citiking and DWC intended for the Debtors to

withdraw their First Sale Motion and instead file the Reorganization Plan. *See* Letter Agreement at 2. DWC agreed in the Letter Agreement that it would not object to the Reorganization Plan as long as the Plan included as a condition precedent that Citiking would pay DWC all outstanding obligations by October 31, 2019, upon which date the Reorganization Plan would be effective. *Id.* Any remaining amounts due to DWC from Citiking would be converted to an exit financing debt of the new company that would emerge from the bankruptcy. *Id.* The Reorganization Plan was filed the day after the Letter Agreement was executed. *See* Keats Decl. Exs. 4–5.

Diligent's claim that an agreement that was formed to facilitate the Reorganization Plan in ONE Aviation's bankruptcy was breached "would have no practical existence *but for* the bankruptcy." *Baker*, 613 F.3d at 351 (2d Cir. 2010) (citation omitted). That the Letter Agreement resolved an impasse in the bankruptcy proceedings and that Diligent's success in litigating its alleged breach could conceivably unwind the sale order of the Bankruptcy Court makes apparent that Diligent's claim is intertwined with the bankruptcy. *See KeyBank Nat'l Ass'n v. Franklin Advisers, Inc.*, 600 B.R. 214, 227–30 (S.D.N.Y. 2019) (intercreditor dispute arose in bankruptcy where the conduct at issue involved the provision of post-petition financing under a DIP Agreement); *Delaware Tr. Co.*, 534 B.R. at 514–18 (payment allocation dispute arising from pre-petition intercreditor agreement deemed core where dispute was intertwined with the bankruptcy proceeding). In concert with the fact that the contract was formed after the Debtors' petition was filed, it is clear that Diligent's claim for breach of the Letter Agreement arises in the bankruptcy.

### b. Breach of the Continuing Obligations Agreement

Diligent's claim that DWC breached the Continuing Obligations Agreement is also a core proceeding. Although the State Complaint is not a model of clarity, the Court understands Diligent to allege that the Second PSA required DWC to deliver the Second Tranche Loans to

Citiking upon receipt of the first installation payment.  Citiking provided the first installment payment on July 15, 2019, *see* State Compl. ¶ 40, but DWC did not deliver the Second Tranche Loans to Citiking.  Because DWC never delivered the loans to Citiking, DWC could not repurchase them, and, therefore, Citiking did not receive the refund DWC owed it under the Continuing Obligations Agreement.  *See id.* ¶¶ 104–06.

Although the pre-petition formation of the Continuing Obligations Agreement counsels in favor of finding the dispute over its breach is non-core, Diligent's claim is a core proceeding. The Second Circuit has instructed courts to give core proceedings "a broad interpretation that is close to or congruent with constitutional limits."  *Tilton v. MBIA Inc.*, 620 B.R. 707, 719 (S.D.N.Y. 2020) (quoting *U.S. Lines*, 197 F.3d at 636–37).  At bottom, Diligent's claim that the Continuing Obligations Agreement was breached is premised on its argument that DWC breached the Letter Agreement; as determined above, any explanation for DWC's failure to comply with its obligations under the latter is intertwined with the parties' obligations in the bankruptcy proceedings.  *See Delaware Tr. Co.*, 534 B.R. at 514–18.  Thus, for the same reasons that the claim for breach of the Letter Agreement is core, Diligent's claim for breach of the Continuing Obligations Agreement is also core.

### c.  Breach of the Intercreditor Agreement

Diligent's claim that DWC breached the Intercreditor Agreement presents a closer question.  Several factors suggest that the proceeding is non-core.  The Intercreditor Agreement predates the bankruptcy petition, *see* State Compl. ¶¶ 18, 44, and the claim is not dependent on any agreement that is intertwined with the bankruptcy proceedings.  The Intercreditor Agreement makes no mention of the bankruptcy proceedings, and, unlike the alleged breach of the Continuing Obligations Agreement, the claim is not premised on a breach of the Letter Agreement.  Rather, Diligent's claim for breach of the Intercreditor Agreement assumes that,

even if DWC had the right to sell the Second Tranche Loans to AML notwithstanding the Letter Agreement, the sale still violated Citiking's right of first refusal. *See id.* ¶ 93. The Bankruptcy Court, when approving the Second Sale Motion, even contemplated that subsequent litigation between Citiking and DWC *might* occur in New York. *See* Keats Decl., Ex. 13, at 28:24–29:5; 41:18–42:10.

A claim that would otherwise be a "creature[] of state law that depend[s] neither on bankruptcy law nor on bankruptcy jurisdiction," *ICICI Bank*, 565 B.R. at 249, can however, be rendered core through actions that indicate consent to the bankruptcy court's jurisdiction. *See Millenium Seacarriers*, 419 F.3d at 98; *see also In re Kirwan Offs. S.a.R.L.*, 792 F. App'x 99, 103 (2d Cir. 2019) (party "implicitly consented to the bankruptcy court's jurisdiction" by presenting claims to the bankruptcy court). A contract dispute can arise in a bankruptcy proceeding where the dispute: (1) is based on the rights established in a sale order; (2) involves interpretation of the bankruptcy court's orders; and (3) was already before the bankruptcy court as part of a party's claims. *See Lothian Cassidy, LLC v. Lothian Expl. & Dev. II, L.P.*, 487 B.R. 158, 162 (S.D.N.Y. 2013) (citing *Petrie Retail*, 304 F.3d at 229–31). Not all of those factors need to be present to deem the proceeding core. *Id.* at 163.

Diligent's claim is not based on any right established in a sale order, but the dispute was raised before the Bankruptcy Court and may involve the interpretation of a Bankruptcy Court order. Well after the Bankruptcy Court's observation of potential future litigation in New York, Citiking objected to the allowance of any claim by AML because DWC's sale of the Second Tranche Loans to AML violated Citiking's right of first refusal contained in the Intercreditor Agreement. Keats Decl., Ex. 23, ¶¶ 8, 16–17, 40–41. Citiking later withdrew its objection in exchange for a distribution of $950,00, as memorialized in a July 14, 2023 Bankruptcy Court order. Keats Decl., Ex. 31, at 2. That order recognized that Citiking's rights and claims were not

affected by the resolution, *see id.*, but the interpretation of the order should lie with the Bankruptcy Court. Coupled with the long history of the bankruptcy proceedings, the Bankruptcy Court "has a vital interest in policing the integrity of the bankruptcy process" in this action. *Lothian Cassidy*, 487 B.R. at 164.

Accordingly, because Citiking raised the breach of the Intercreditor Agreement in the bankruptcy proceedings, Diligent's claim for breach of the Intercreditor Agreement is a core proceeding.

### 3. *Diligent's Tort Claims Are Core Proceedings*

Diligent's various tort claims unquestionably arise in the bankruptcy proceedings. The standard for "arising in" jurisdiction over tort claims is the same as breach of contract claims: namely, whether the claim "would have no practical existence *but for* the bankruptcy." *Baker*, 613 F.3d at 351 (citation omitted). "[T]he determinative issue is whether claims that appear to be based in state law are really an extension of the proceedings already before the bankruptcy court." *Id.* at 350. Claims that "implicate[] the integrity of the entire bankruptcy process" likewise arise in the bankruptcy proceeding. *Id.* at 351 (citation omitted).

Diligent's tortious interference claim against AML and civil conspiracy claim against AML and DWC are core proceedings. Both claims assert that AML and DWC conspired to freeze Citiking out of the bidding process in ONE Aviation's bankruptcy. *See* State Compl. ¶¶ 112, 115. Those claims, which are rooted in actions that took place in the bankruptcy proceedings and directly attack the sale order eventually entered as to which Citiking was not the Stalking Horse Buyer, would not exist outside the bankruptcy and call into question the integrity of the process employed by the Bankruptcy Court in reaching the sale order. *See Baker*, 613 F.3d at 350–51.

Diligent's fraudulent misrepresentation claims against the Individual Defendants also arise in ONE Aviation's bankruptcy. Diligent alleges that the Individual Defendants were integral to ONE Aviation obtaining the DIP Loan from Citiking, including an initial $19.1 million distribution under the DIP Loan as well as an additional $7 million pursuant to the Reorganization Plan. *See* State Compl. ¶¶ 49–50. The Individual Defendants allegedly agreed to place $1.7 million of the $7 million that was earmarked for distribution to unsecured creditors into escrow. *Id.* ¶¶ 51–53. Diligent asserts that the Individual Defendants fraudulently induced Citiking into providing that funding for ONE Aviation's bankruptcy, including the $1.7 million earmarked for escrow. *Id.* ¶¶ 123–40. The allegations that Citiking was fraudulently induced to provide the DIP Loan "are uniquely affected by a core bankruptcy function because they are based on rights that were established in an order to obtain credit and to use cash collateral" in the bankruptcy; the claim is, therefore, core. *KeyBank*, 600 B.R. at 227.

Diligent claims that Klapmeier misrepresented that certain IP assets belonged to him, not the Debtors, and attempted to make a side deal with Citiking regarding those assets. State Compl. ¶ 142. Diligent alleges that those machinations resulted in Citiking losing the opportunity to obtain the assets through a bankruptcy sale. *Id.* ¶¶ 141–46. The Court agrees with Defendants that the Bankruptcy Court's "vital interest in policing the integrity of the bankruptcy process in general" counsels in favor of finding the proceeding core, as Diligent is alleging that a ONE Aviation director attempted to sell estate assets outside of the bankruptcy process. *Winstar Holdings, LLC v. Blackstone Grp. L.P.*, No. 07 CIV. 4634 (GEL), 2007 WL 4323003, at *5 (S.D.N.Y. Dec. 10, 2007).

Finally, Diligent accuses Klapmeier, Siegel, and Serfling of tricking Citiking into paying for their personal trip to Israel. Purportedly, there was a business opportunity for a reorganized ONE Aviation and Citiking to form a joint venture with an Israeli company. State Compl. ¶¶

147–52.  Although the threadbare nature of the allegations renders the analysis somewhat difficult, it is clear that the claim pertains to business opportunities Citiking was exploring for ONE Aviation during the course of its reorganization; that claim would not exist outside of the bankruptcy proceedings that gave rise to the reorganization.  *See Baker*, 613 F.3d at 351 (citation omitted).  Thus, Diligent's fraudulent misrepresentation claim is a core proceeding.

### 4.  *Permissive Abstention Does Not Apply to Diligent's Claims*

The Court declines to remand this action on the basis of permissive abstention.[7]  In analyzing permissive abstention, courts in this District consider one or more of twelve factors to balance efficient bankruptcy administration against comity.  *See Fried*, 496 B.R. at 712–13.  A handful of factors favor permissive abstention: there is "a related proceeding commenced in state court," as Defendants removed this action from state court, and there is no "jurisdictional basis" other than 28 U.S.C. § 1334.  *Id.* (citation omitted).  But, Diligent's state law claims "are not novel or complex," and the state court "invested little or no time" on this action before Defendants removed to this Court.  *Deutsche Oel & Gas S.A. v. Energy Cap. Partners Mezzanine Opportunities Fund A, LP*, No. 19-CV-11058 (RA), 2020 WL 5814233, at *12 (S.D.N.Y. Sept. 30, 2020) (citation omitted).  The factors supporting efficient administration of the bankruptcy estate counsel strongly against abstention.  Rather than "predominate over bankruptcy issues," *Fried*, 496 B.R. at 712 (citation omitted), the state law issues are intertwined with ONE Aviation's bankruptcy.  DWC and Citiking entered into the Letter Agreement to resolve issues pertaining to the bankruptcy, and Diligent's tort claims are rooted in conduct that occurred during core bankruptcy activities, such as credit bidding, or otherwise call into question the integrity of the process the Bankruptcy Court employed.  The close relation with the bankruptcy

---

[7]    Because Diligent's claims arise in the bankruptcy proceedings, mandatory abstention does not apply.  *See* 28 U.S.C. § 1334(c)(2).

proceedings and the Bankruptcy Court's greater familiarity with the factual allegations underlying Diligent's claims further support the conclusion that denying the motion to remand would not offend principles of comity.

Diligent's motion to remand this action is DENIED.

### B. Defendants' Motion to Transfer

Transfer motions for core bankruptcy proceedings are governed by 28 U.S.C. § 1412, which provides that "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."[8] *Argosy Cap. Grp. III, L.P. v. Triangle Cap. Corp.*, No. 17 CIV. 9845 (ER), 2019 WL 140730, at *4 (S.D.N.Y. Jan. 9, 2019) (quoting 28 U.S.C. § 1412). The analysis under § 1412 is "substantially the same" as the general venue transfer statute, 28 U.S.C. § 1404(a). *ICICI Bank*, 565 B.R. at 257 (citation omitted). Under § 1404(a), the movant "bears the burden of showing by clear and convincing evidence that transfer is warranted," *id.* at 250; under § 1412, however, the burden is reduced to a preponderance of the evidence, and "the district in which the underlying bankruptcy case is pending is presumed to be the appropriate district for hearing and determination of a proceeding in bankruptcy," *Argosy Cap.*, 2019 WL 140730, at *5 (quoting *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1391 (2d Cir. 1990)). Defendants must establish by a preponderance of the evidence that Diligent's action could have been brought in the District of Delaware, which the Court presumes is the appropriate forum, and that the balance of interests favors transfer. *See FameFlynet, Inc. v. Jasmine Enters., Inc.*, No. 16-CV-7632 (VEC), 2017 WL 11715487, at *1 (S.D.N.Y. June 16, 2017).

---

[8] Diligent's argument that § 1412 only applies to cases that arise under the Bankruptcy Code is unavailing. It cites *Onewoo Corp. v. Hampshire Brands, Inc.* for the proposition that a "very long line of decisions" supports its position, but the cases relied on in *Onewoo* reinforce the Court's position that § 1412 applies to core proceedings, and cases that arise in bankruptcy proceedings are core. 566 B.R. 136, 140 (Bankr. S.D.N.Y. 2017).

Diligent argues that the New York forum selection clauses in the agreements between DWC and Citiking prohibit transfer. Courts within and outside this District are split as to the weight that should be afforded a forum selection clause that arises in the context of a core bankruptcy proceeding. Several courts "have held that when a proceeding is core, the public interest in centralizing bankruptcy proceedings always outweighs the public and private interests in enforcing a forum-selection clause, unless the core proceeding is inextricably intertwined with non-core matters." *ResCap Liquidating Tr. v. PHH Mortg. Corp.*, 518 B.R. 259, 268 (S.D.N.Y. 2014) (collecting cases). Others "have instead balanced the public interest in centralizing a particular core proceeding in a bankruptcy court against the parties' legitimate expectations and the interest of justice in enforcing a forum-selection clause." *Id.* (collecting cases).

This Court joins those courts who have adopted a *per se* rule that a forum selection clause cannot outweigh the public interest in centralizing bankruptcy proceedings, unless that proceeding is inextricably intertwined with non-core matters. Diligent's action is a core proceeding, and there are no countervailing non-core matters justifying enforcement of the forum selection clause. As to the tort claims, which are not subject to the forum selection clauses, Diligent "is asking another court to rule on whether the [D]efendants' conduct in the" bankruptcy proceeding constituted a fraud or tortious interference; such "situation is simply untenable." *Credit Suisse AG v. Appaloosa Inv. Ltd. P'ship I*, No. 15-CV-3474 SAS, 2015 WL 5257003, at *12 (S.D.N.Y. Sept. 9, 2015).

The weight of the § 1404(a) factors also favors transfer. *See Argosy*, 2019 WL 140730, at *7. As alleged in the State Complaint, the relevant events largely occurred in Delaware, where AML and Diligent purportedly conspired to deny Citiking its right to credit bid, and the bankruptcy proceedings remain ongoing; "the Bankruptcy Court simply is in a better position to

adjudicate this action, as is the district in which Bankruptcy Court sits." *Id.* at *8. The interests of justice and judicial economy further mandate transfer.

Accordingly, Defendants' motion to transfer is GRANTED.

## II. Defendants' Motion for Costs and Sanctions

Defendants, except DWC,[9] move pursuant to Rule 41(d) for the costs they incurred in connection with *Diligent I* and pursuant to Rule 11 for sanctions in the form of their costs incurred in (a) responding to Diligent's attempted second no-prejudice dismissal and (b) preparing the instant sanctions motion.

### A. Rule 41(d) Entitles Moving Defendants to Costs Incurred in *Diligent I*

Moving Defendants are entitled to the costs they incurred in *Diligent I*. Under Rule 41(d), "[i]f a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant," the court has discretion to "order the plaintiff to pay all or part of the costs of that previous action" and to "stay the proceedings until the plaintiff has complied." Fed. R. Civ. P. 41(d). The exact scenario contemplated by the plain text of the rule occurred here. Diligent dismissed *Diligent I* without prejudice and then filed another lawsuit the same day against many of the same defendants asserting the same claims. *See Diligent I*, Dkt. 26; Dkt. 1.

Diligent's reliance on *Freedman v. Rakosi*, No. 1:23cv472 (AT) (SDA), 2024 U.S. Dist. LEXIS 145118 (S.D.N.Y. Aug. 14, 2024), for the proposition that Rule 41(d) only applies where the second action is filed in federal court is readily distinguishable. In *Freedman*, after filing the lawsuit, the plaintiffs determined that subject matter jurisdiction was lacking for diversity; they voluntarily dismissed the case and re-filed in state court. *Id.* at *4–5. In assessing the

---

[9]    The Court hereinafter refers to Defendants who moved for costs and sanctions as "Moving Defendants."

defendants' request for attorneys' fees, the court reasoned that "Rule 41(d) makes plain that only the court before which the new action is filed is given power under the rule to award the costs of the dismissed action" and does not apply "where a plaintiff refiles his state law claims in state court only after he has excised his federal claims altogether and therefore incurs the effective penalty of foregoing his federal claims." *Id.* at \*11 (citation omitted). *Freedman* did not address removal, and unlike *Freedman*, the second action is pending before this Court, rather than pending in state court. Several courts in this Circuit have granted Rule 41(d) requests for costs in removed cases. *See Thompson v. Spin the Planet, Inc.*, No. 18-CV-6755 CJS, 2019 WL 591705, at \*3 (W.D.N.Y. Feb. 12, 2019); *Benitez v. Good2Go Ins., Inc.*, No. 3:20CV69 (JBA), 2020 WL 4529879 (D. Conn. Aug. 6, 2020).

As the Court already determined, Diligent's conduct in dismissing and re-filing its lawsuit was "perplexing" and "unduly vexatious." Dkt. 17 at 3. Diligent's proffered reasons for the re-filing are not persuasive, and Moving Defendants are awarded costs incurred in *Diligent I*.

### B.  Moving Defendants' Rule 11 Motion for Sanctions is Denied

Under Rule 11(b)(1) any paper submitted to the court must not be "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1). Rule 11 contains a safe harbor provision that requires a motion for sanctions to be served on the allegedly offending party, but not filed, for a minimum of 21 days to give the offending party an opportunity to cure. Fed. R. Civ. P. 11(c)(2). Rule 11's "safe-harbor provision is a strict procedural requirement." *Star Mark Mgmt. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012). Motions for sanctions "have been disallowed as untimely when filed after a point in the litigation when the lawyer sought to be sanctioned lacked an opportunity to correct or withdraw the challenged submission." *In re Pennie & Edmonds LLP*, 323 F.3d 86, 89 (2d Cir. 2003).

Moving Defendants seek sanctions for Diligent's April 24, 2024 second attempt at a no-prejudice dismissal.  Although Moving Defendants complied with Rule 11's safe harbor provision through serving their motion on Diligent, service did not occur until August 26, 2024, *see* Dkt. 52-1, well after the Court had denied Diligent's motion to voluntarily dismiss this case. *See Pennie & Edmonds*, 323 F.3d at 89 n.1 ("[A] party cannot delay serving its Rule 11 motion until . . . judicial rejection of the offending contention[.]" (quoting Fed. R. Civ. P. 11 advisory committee's note to 1993 Amendments)).  Although Diligent's conduct was undoubtedly vexatious, Moving Defendants' delay in serving its sanctions motion denied Diligent the opportunity to cure its alleged misconduct by, for example, withdrawing the motion.  For that reason, the Court cannot grant Defendants' motion for Rule 11 sanctions.

### C.  The Court Will Not Stay This Action

Rule 41(d) empowers courts to stay the second-filed action until the offending plaintiff pays the costs of the previous action.  Fed. R. Civ. P. 41(d)(2).  Defendants' submissions make clear that Diligent's claims are intertwined with the proceedings in the Bankruptcy Court, which remain open due to the pendency of this lawsuit.  Staying this action, rather than ordering an immediate transfer to the District Court for the District of Delaware, could unduly delay resolution of ONE Aviation's bankruptcy estate.  The Court declines to do so.

### CONCLUSION

For the foregoing reasons, Diligent's motion to remand this action to state court is DENIED.  Defendants' motion to transfer this action to the United States District Court for the District of Delaware is GRANTED.  Moving Defendants' motion for costs pursuant to Rule 41(d) is GRANTED, but their motion for sanctions pursuant to Rule 11 is DENIED.

The Clerk of Court is respectfully directed to transfer this case to the United States District Court for the District of Delaware and to terminate the open motions at Dkts. 44, 47, and 50.

The Court retains limited jurisdiction to enforce the Rule 41(d) fee award. The parties are ordered to meet and confer in a good faith attempt to resolve the amount due to Moving Defendants as attorneys' fees and costs in connection with *Diligent I*. They must file a joint letter not later than **Tuesday, June 24, 2025**, stating whether they have reached a resolution. If the parties fail to reach a resolution, the Court will refer them to a Magistrate Judge for a hearing to determine the amount of attorneys' fees due to Moving Defendants.

**SO ORDERED.**

Date:  **May 27, 2025**
       **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**